## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>PEABODY ENERGY CORPORATION., et al.,<br><br>                   Debtors. | Chapter 11 Case No.<br>16-42529-399<br>(Jointly Administered) |
| PEABODY ENERGY CORPORATION; AMERICAN LAND DEVELOPMENT, LLC; AMERICAN LAND HOLDINGS OF COLORADO, LLC; AMERICAN LAND HOLDINGS OF ILLINOIS, LLC; AMERICAN LAND HOLDINGS OF INDIANA, LLC; AMERICAN LAND HOLDINGS OF KENTUCKY, LLC; AMERICAN LAND HOLDINGS OF NEW MEXICO, LLC; AMERICAN LAND HOLDINGS OF WEST VIRGINIA, LLC; ARID OPERATIONS INC.; BIG RIDGE, INC.; BIG SKY COAL COMPANY; BLACK HILLS MINING COMPANY, LLC; BTU WESTERN RESOURCES, INC.; CABALLO GRANDE, LLC; CASEYVILLE DOCK COMPANY, LLC; CENTRAL STATES COAL RESERVES OF ILLINOIS, LLC; CENTRAL STATES COAL RESERVES OF INDIANA, LLC; CENTURY MINERAL RESOURCES, INC.; COAL RESERVE HOLDING LIMITED LIABILITY COMPANY NO. 1; COALSALES II, LLC; COLORADO YAMPA COAL COMPANY; CONSERVANCY RESOURCES, LLC; COTTONWOOD LAND COMPANY; CYPRUS CREEK LAND COMPANY; CYPRUS CREEK LAND RESOURCES, LLC; DYSON CREEK COAL COMPANY, LLC; DYSON CREEK MINING COMPANY, LLC; EL SEGUNDO COAL COMPANY, LLC; EMPIRE LAND HOLDINGS, LLC; FALCON COAL COMPANY, LLC; FRANCISCO EQUIPMENT COMPANY, LLC; FRANCISCO LAND HOLDINGS COMPANY, LLC; FRANCISCO MINING, LLC; GALLO FINANCE COMPANY; GOLD FIELDS CHILE, LLC; GOLD FIELDS MINING, LLC; GOLD FIELDS ORTIZ, LLC; HAYDEN GULCH TERMINAL, LLC; HIGHWALL MINING SERVICES COMPANY; HILLSIDE RECREATIONAL LANDS, LLC; HMC MINING, LLC; ILLINOIS LAND HOLDINGS, LLC; INDEPENDENCE MATERIAL HANDLING, LLC; JAMES RIVER COAL TERMINAL, LLC; JUNIPER COAL COMPANY; KAYENTA MOBILE HOME PARK, INC.; KENTUCKY SYNGAS, LLC; LIVELY GROVE ENERGY, LLC; LIVELY GROVE ENERGY PARTNERS, LLC; MARIGOLD ELECTRICITY, LLC; MIDCO SUPPLY AND EQUIPMENT | Adversary Proceeding No. 16-_____ |

CORPORATION; MIDWEST COAL ACQUISITION CORP.;
MIDWEST COAL RESERVES OF ILLINOIS, LLC; MIDWEST
COAL RESERVES OF INDIANA, LLC; MOFFAT COUNTY
MINING, LLC; MUSTANG ENERGY COMPANY, LLC; NEW
MEXICO COAL RESOURCES, LLC; NM EQUIPMENT
COMPANY, LLC; PACIFIC EXPORT RESOURCES, LLC;
PEABODY AMERICA, INC.; PEABODY ARCHVEYOR, L.L.C.;
PEABODY ARCLAR MINING, LLC; PEABODY BEAR RUN
MINING, LLC; PEABODY BEAR RUN SERVICES, LLC;
PEABODY CABALLO MINING, LLC; PEABODY CARDINAL
GASIFICATION, LLC; PEABODY COALSALES, LLC; PEABODY
COALTRADE, LLC; PEABODY COALTRADE
INTERNATIONAL (CTI), LLC; PEABODY COLORADO
OPERATIONS, LLC; PEABODY COLORADO SERVICES, LLC;
PEABODY COULTERVILLE MINING, LLC; PEABODY
DEVELOPMENT COMPANY, LLC; PEABODY ELECTRICITY,
LLC; PEABODY EMPLOYMENT SERVICES, LLC; PEABODY
ENERGY GENERATION HOLDING COMPANY; PEABODY
ENERGY INVESTMENTS, INC.; PEABODY ENERGY
SOLUTIONS, INC.; PEABODY GATEWAY NORTH MINING,
LLC; PEABODY GATEWAY SERVICES, LLC; PEABODY
HOLDING COMPANY, LLC; PEABODY ILLINOIS SERVICES,
LLC; PEABODY INDIANA SERVICES, LLC; PEABODY
INTERNATIONAL INVESTMENTS, INC.; PEABODY
INTERNATIONAL SERVICES, INC.; PEABODY INVESTMENTS
CORP.; PEABODY MAGNOLIA GROVE HOLDINGS, LLC;
PEABODY MIDWEST MANAGEMENT SERVICES, LLC;
PEABODY MIDWEST MINING, LLC; PEABODY MIDWEST
OPERATIONS, LLC; PEABODY MIDWEST SERVICES, LLC;
PEABODY NATURAL GAS, LLC; PEABODY NATURAL
RESOURCES COMPANY; PEABODY NEW MEXICO SERVICES,
LLC; PEABODY OPERATIONS HOLDING, LLC; PEABODY
POWDER RIVER MINING, LLC; PEABODY POWDER RIVER
OPERATIONS, LLC; PEABODY POWDER RIVER SERVICES,
LLC; PEABODY POWERTREE INVESTMENTS, LLC; PEABODY
RECREATIONAL LANDS, L.L.C.; PEABODY ROCKY
MOUNTAIN MANAGEMENT SERVICES, LLC; PEABODY
ROCKY MOUNTAIN SERVICES, LLC; PEABODY SAGE CREEK
MINING, LLC; PEABODY SCHOOL CREEK MINING, LLC;
PEABODY SERVICES HOLDINGS, LLC; PEABODY
SOUTHWEST, LLC; PEABODY SOUTHWESTERN COAL
COMPANY; PEABODY TERMINAL HOLDING COMPANY,
INC.; PEABODY TERMINALS, LLC; PEABODY TROUT CREEK
RESERVOIR LLC; PEABODY TWENTYMILE MINING, LLC;
PEABODY VENEZUELA COAL CORP.; PEABODY VENTURE
FUND, LLC; PEABODY-WATERSIDE DEVELOPMENT, L.L.C.;

PEABODY WESTERN COAL COMPANY; PEABODY WILD
BOAR MINING, LLC; PEABODY WILD BOAR SERVICES, LLC;
PEABODY WILLIAMS FORK MINING, LLC; PEABODY
WYOMING GAS, LLC; PEABODY WYOMING SERVICES, LLC;
PEC EQUIPMENT COMPANY, LLC; POINT PLEASANT DOCK
COMPANY, LLC; POND RIVER LAND COMPANY; PORCUPINE
PRODUCTION, LLC; PORCUPINE TRANSPORTATION, LLC;
RIVERVIEW TERMINAL COMPANY; SAGE CREEK
HOLDINGS, LLC; SAGE CREEK LAND & RESERVES, LLC;
SCHOOL CREEK COAL RESOURCES, LLC; SENECA COAL
COMPANY, LLC; SHOSHONE COAL CORPORATION; STAR
LAKE ENERGY COMPANY, L.L.C.; SUGAR CAMP
PROPERTIES, LLC; THOROUGHBRED GENERATING
COMPANY, LLC; THOROUGHBRED MINING COMPANY,
L.L.C.; TWENTYMILE COAL, LLC; TWENTYMILE HOLDINGS,
LLC; WEST ROUNDUP RESOURCES, LLC; WILD BOAR
EQUIPMENT COMPANY, LLC; and WILD BOAR LAND
HOLDINGS COMPANY LLC;

                              Plaintiffs,

          -against-

CITIBANK, N.A., in its capacity as Administrative Agent under that
certain Amended and Restated Credit Agreement and Pledge and
Security Agreement; and WILMINGTON SAVINGS FUND
SOCIETY FSB, in its capacity as trustee with respect to the 10%
senior secured notes due March 15, 2022,

                              Defendants.

## COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT

Peabody Energy Corporation ("PEC") and certain affiliated debtors and debtors in

possession (collectively, "Peabody" or "Plaintiffs"), file this complaint pursuant to 28 U.S.C. §

2201 against defendants (1) Citibank, N.A., in its capacity as Administrative Agent under both

the (a) Amended and Restated Credit Agreement, dated September 24, 2013 (the "2013 Credit

Agreement"), as amended by the Omnibus Amendment Agreement, dated February 5, 2015 (the

"Omnibus Amendment Agreement," and, with the 2013 Credit Agreement and the Correction

Letter dated March 15, 2015, the "First-Lien Credit Agreement") and (b) Pledge and Security

Agreement with PEC and each subsidiary identified therein, dated February 5, 2015 (the "Pledge

Agreement") (hereinafter, "Citibank") and (2) Wilmington Savings Fund Society FSB, in its

capacity as Trustee and Collateral Agent for the 10% senior secured notes due March 15, 2022 (hereinafter, "Wilmington Bank"), and respectfully allege as follows:

## SUMMARY OF THE ACTION

1.      Peabody requests declaratory relief with respect to a dispute, the resolution of which is critical to Peabody's restructuring efforts and a precondition to Peabody's ability to propose a confirmable chapter 11 plan. A disagreement exists about the amount of indebtedness that is secured by certain real property assets (both mines and reserves) located in the United States, i.e., Principal Property (as defined below). Peabody believes its secured creditors will maintain that (a) compliance with the Principal Property Covenant (as defined below) is measured using an incurrence test; and (b) the covenant's limitation on the amount of debt that is secured by Principal Property (i.e., the Principal Property Cap (as defined below)) is calculated by subtracting from Peabody's assets its current liabilities, excluding long-term debt that is classified as "current" under United States Generally Accepted Accounting Principles ("GAAP"). Peabody disagrees. Under the clear terms of the relevant agreements, compliance with the Principal Property Covenant is measured using a maintenance test; the Principal Property Cap is calculated by including long-term debt that is classified as current under GAAP (significantly lowering the cap); and, with the adjusted calculation, additional properties that were not previously designated as Principal Property and thus were fully encumbered, now constitute Principal Property—subjecting the indebtedness secured thereby to the cap. The terms of Peabody's DIP Financing Agreement[1] require that Peabody submit this dispute for judicial resolution by May 23, 2016 and that the Court enter an Order resolving the dispute within 180 days of the Petition Date. Accordingly, Peabody brings this complaint for declaratory judgment.

---

[1]      See Super-Priority Secured Debtor In Possession Credit Agreement (Bankr. Docket No. 45-2) (as amended, the "DIP Financing Agreement") at 94 (§ 6.19(c)).

4

2.      Between 2006 and 2013, nearly all of Peabody's funded indebtedness, including term loans, revolving credit facilities, and approximately $4.5 billion in bond debt, was unsecured.  Moreover, the indentures governing the debt issued during this period impose strict conditions on Peabody's ability to maintain and incur secured debt.  The indentures' covenants preclude PEC from maintaining or incurring debt secured by a lien "upon any Principal Property or shares of Capital Stock or Indebtedness" unless PEC provides "equal and ratable" security with respect to the debt issued under those indentures.  "Principal Property" consists of Peabody's real property located in the United States (including mines and reserves) (i.e., the "U.S. Properties") that has a gross book value in excess of 1% of Peabody's "Consolidated Net Tangible Assets" or "CNTA."

3.      There is, however, a carve-out from the covenant.  The indentures entitle Peabody to maintain (at any particular time) or incur debt secured by liens on Principal Property without equally and ratably securing the debt so long as the amount of that debt does not exceed 15% of CNTA.  While Peabody can maintain (at any particular time) or incur some amount of secured debt without violating the indentures' covenants, that limitation caps the amount of debt Peabody can collateralize with Principal Property.

4.      In 2013, Peabody entered into the 2013 Credit Agreement—Peabody's first credit agreement since 2006 that included a collateral pledge.  The limitations in the indentures' covenants against the maintenance (at any particular time) or incurrence of secured debt circumscribed Peabody's options for providing security.  To avoid triggering Peabody's obligation in the indentures to provide equal and ratable collateral, Citibank proposed that the 2013 Credit Agreement include a limited collateral grant with respect to certain assets that were not Principal Property, i.e., pledges of 65% of the stock of Peabody Investments (Gibraltar) Limited ("Peabody Gibraltar") and 100% of the stock of Peabody IC Funding Corp. ("Peabody

5

IC Funding"). The loans available to Peabody under the 2013 Credit Agreement totaled approximately $2.85 billion.

5.       In February 2015, the parties amended the 2013 Credit Agreement pursuant to the Omnibus Amendment Agreement. The amended agreement constitutes the First-Lien Credit Agreement (a copy of which is attached as Exhibit A (without schedules and exhibits)). It contains modified negative covenants, lien covenants, and financial maintenance covenants. However, the lenders under the First-Lien Credit Agreement (hereinafter, the "First Lien Lenders") did not extend any new money or otherwise increase the size of the loans above the amounts extended under the 2013 Credit Agreement (i.e., $2.85 billion).

6.       In exchange for the covenant relief, Peabody pledged additional collateral in connection with the First-Lien Credit Agreement. In addition to the assets already pledged in connection with the 2013 Credit Agreement, Peabody also provided security for the benefit of the lenders consisting of certain Non-Principal Property (defined below).

7.       The lenders requested that the pledged collateral also include Principal Property subject to the covenant limitations in the indentures. To avoid triggering Peabody's obligation in the indentures to provide equal and ratable collateral with respect to the unsecured debt, a "floating lien" concept was proposed with respect to Principal Property: the amount of debt secured by Principal Property would be expressly limited by a cap that adjusts automatically and continuously so that—at all times—the amount of that debt would never exceed the limitation in the indentures, less a "buffer" of $50 million. The First-Lien Credit Agreement incorporated the "floating lien" concept in section 6.16(g), which is an affirmative covenant that limits the amount of debt that Peabody can secure with Principal Property (hereinafter, the "Principal Property Covenant") by prohibiting that debt amount from exceeding the Principal Property Cap (as defined below).

8.      The calculation of the Principal Property Cap is the crux of the dispute at issue in this litigation.

9.      The First-Lien Credit Agreement defines the "Principal Property Cap" to mean, "as of the date of determination, with respect to a Lien securing Specified Indebtedness, 15% of [CNTA] . . . as determined on such date under the applicable Reference Indenture minus . . . $50,000,000 . . . ."

10.     CNTA means "the total of all the assets appearing on the most recent consolidated balance sheet prepared in accordance with GAAP … as of the end of the last fiscal quarter for which financial information is available … after deducting from such amount (a) *all current liabilities*, including current maturities of long-term debt and current maturities of obligations under capital leases (other than any portion thereof maturing after, or renewable or extendible at the option of the Company or the relevant Subsidiary beyond twelve months from the date of determination)."

11.     On March 15, 2016, Peabody's independent auditor, Ernst & Young ("E&Y"), submitted its Report of Independent Registered Public Accounting Firm (the "E&Y Audit Opinion"), which included a going-concern opinion expressing "substantial doubt about the Company's ability to meet its obligations as they become due within one year after the date of this report and continue as a going concern."

12.     On March 16, 2016, Peabody filed its Form 10-K (the "2015 Form 10-K") with the Securities & Exchange Commission (the "SEC").  The consolidated financial statements for the year ended December 31, 2015 set forth in the 2015 Form 10-K included a "going concern" paragraph in the E&Y Audit Opinion.  Unless remedied within 30 days, the inclusion of the going-concern paragraph would give rise to an Event of Default under the First-Lien Credit Agreement, which would trigger cross-defaults under the Unsecured Notes Indentures.  GAAP required Peabody to classify its long-term debt on its financial statements as "current liabilities."

7

Thus, the consolidated balance sheet in the 2015 Form 10-K for the fiscal year ending December 31, 2015 lists approximately $7.4 billion in total current liabilities—a figure that includes the principal amount of Peabody's secured debt and most of its unsecured notes.

13.    Classifying long-term debt as a current liability significantly reduces CNTA, which, in turn (a) reduces the Principal Property Cap, and therefore the extent to which Peabody's first-lien and second-lien indebtedness is collateralized by Principal Property and (b) expands the universe of property that, while previously fully encumbered as Non-Principal Property, now satisfies the Principal Property definition (i.e., 1% of CNTA) and therefore becomes subject to the Principal Property Cap.

14.    Peabody's commencement of its chapter 11 cases (the "Bankruptcy Cases") on April 13, 2016 (the "Petition Date") constituted an "Event of Default" under each of the First-Lien Credit Agreement, the Second-Lien Notes Indenture,[2] and the unsecured notes indentures, triggering automatic acceleration provisions in those agreements that make principal amounts outstanding thereunder due immediately.

15.    Peabody believes its secured lenders will maintain that (a) compliance with the Principal Property Covenant is measured using an incurrence test (i.e., tested when debt is incurred) because the Principal Property Covenant and the Principal Property Cap calculation are tied directly to covenants and defined terms, e.g., CNTA, set forth in the indentures; (b) the last date when Peabody incurred debt for CNTA purposes was February 2016 (i.e., a revolver draw); (c) since the purported incurrence date occurred before Peabody classified its long-term debt as "current liabilities" in the 2015 Form 10-K, that classification is irrelevant to the calculation; and (d) under any circumstances, for purposes of calculating CNTA and the Principal Property Cap,

---

[2]    On March 15, 2015, PEC issued those certain 10% senior secured notes due March 15, 2022 (the "Second-Lien Notes," and, the holders of such notes, the "Second-Lien Noteholders") pursuant to the Indenture dated March 15, 2015 with U.S. Bank, National Association as Trustee (the "Second-Lien Notes Indenture"). The Second-Lien Notes are secured by a second-priority lien on all of the assets that secure Peabody's obligations under the First-Lien Credit Agreement, subject to permitted liens and other limitations.

current liabilities do not include long-term debt—irrespective of whether those obligations are classified as current according to GAAP.

16.    The provisions in the First-Lien Credit Agreement and the Second-Lien Notes Indenture, however, are not ambiguous and do not support that interpretation.  Under the plain meaning of the terms in those agreements, compliance with the Principal Property Covenant is measured automatically and continuously using a maintenance test (i.e., at all times)—and, in any event, Peabody "incurred" debt under the First-Lien Credit Agreement and with respect to the Second-Lien Notes Indenture through and including the Petition Date.  Moreover, Peabody's long-term indebtedness became current liabilities on Peabody's December 31, 2015 consolidated balance sheet in accordance with GAAP (save approximately $400 million); and, all its long-term indebtedness matured and became due and payable under the terms of the relevant agreements in April 2016 by virtue of the filing of the Bankruptcy Cases.  Accordingly, that long-term debt is included when calculating the Principal Property Cap.

17.    This dispute must be resolved in order for Peabody to craft a confirmable chapter 11 plan whose terms reflect the contractual and legal entitlements of its various creditors. Peabody submits the terms of its financing agreements should be applied in the unambiguous form in which they were written and therefore requests an Order declaring that:

    (a) compliance with the Principal Property Covenant is measured using a maintenance test, not an incurrence test;

    (b) the term "Specified Indebtedness" in the Principal Property Covenant includes all amounts owing under financing agreements, including amounts owing with respect to letters of credit and swap-agreements;

    (c) the appropriate calculation of the Principal Property Cap, and specifically the term "current liabilities" for purposes of CNTA, includes all of Peabody's long-term debt that is classified as current liabilities under GAAP;

    (d) the Principal Property Cap is an amount not greater than $505 million; and

9

(e) the U.S. Properties identified on <u>Schedule 2</u>, whose gross book values exceed 1% of CNTA (as adjusted to account for long-term debt classified as current liabilities), constitute Principal Property for purposes of the Principal Property Cap.

18.    Absent declaratory relief, disputes over these issues will delay the administration of these Bankruptcy Cases and hamper Peabody's ability to craft a confirmable chapter 11 plan and emerge timely from bankruptcy protection.

## THE PARTIES

19.    PEC is a Delaware corporation having its principal place of business at 701 Market Street, Suite 760, St. Louis, MO 63101.

20.    The identities of the other Peabody Plaintiffs, each of whom is a debtor and debtor in possession in the Bankruptcy Cases, as well as their respective states of incorporation and principal place of business, are set forth in <u>Schedule 1</u> hereto.

21.    Each of the Peabody Plaintiffs is a "Grantor" under the Pledge Agreement.

22.    Citibank is a national banking association having its principal place of business located in Sioux Falls, South Dakota.

23.    Wilmington Bank is a Delaware corporation having its principal place of business located in Wilmington, Delaware.

## JURISDICTION AND VENUE

24.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 2201, 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

25.    The statutory predicate for relief is 28 U.S.C. § 2201.

26.    Venue is proper before this Court pursuant to 28 U.S.C. § 1409 because (a) the Bankruptcy Cases to which this proceeding is related is in this Court, and (b) none of the exceptions set forth in 28 U.S.C. § 1409 applies to this proceeding.

27.    The Court has the authority to enter final orders and judgment with respect to any and all issues in this proceeding.

**FACTUAL ALLEGATIONS**

A.   UNSECURED NOTES INDENTURES

28.     Pursuant to the Indenture dated as of October 12, 2006 with U.S. Bank as Trustee (the "2026 Notes Indenture"), PEC issued the 7.875% Senior Notes due 2026 (the "2026 Notes").

29.     As of the Petition Date, $250 million in principal amount of the 2026 Notes was outstanding.

30.     Pursuant to the Indenture dated as of August 25, 2010 with U.S. Bank as Trustee (the "2020 Notes Indenture"), PEC issued the 6.500% Senior Notes Due 2020 (the "2020 Notes").

31.     As of the Petition Date, $650 million in principal amount of the 2020 Notes was outstanding.

32.     Pursuant to the Indenture dated as of November 15, 2011 with U.S. Bank as Trustee (the "2021 & 2018 Notes Indenture," and, with the 2026 Notes Indenture and the 2020 Notes Indenture, the "Unsecured Notes Indentures"), PEC issued the 6.25% Senior Notes Due 2021 (the "2021 Notes") and the 6.00% Senior Notes Due 2018 (the "2018 Notes," and, with the 2026 Notes, the 2020 Notes, and the 2021 Notes, the "Unsecured Notes," and the holders of such notes, the "Unsecured Noteholders").  Copies of the Unsecured Notes Indentures are attached hereto as Exhibits B1, B2, & B3.

33.     As of the Petition Date, $1.3 billion in principal amount of the 2021 Notes was outstanding, and $1.5 billion in principal amount of the 2018 Notes was outstanding.

34.     Pursuant to the Indenture dated as of December 20, 2006 with U.S. Bank as Trustee (the "2066 Subordinated Notes Indenture"), which supplemented the Base Indenture dated as of December 20, 2006 (the "Subordinated Notes Base Indenture"), PEC issued the 4.75% Convertible Junior Subordinated Debentures Due 2066 (the "2066 Subordinated Notes").

35.     As of the Petition Date, $732.5 million in principal amount of the 2066 Subordinated Notes was outstanding.

**B.     2006-2013:  PEABODY INCURS DEBT ON AN UNSECURED BASIS**

36.     In September 15, 2006, Peabody replaced its then-existing secured credit facility with a substantially larger unsecured facility.

37.     Between 2006 and 2013, the substantial majority of the debt incurred by Peabody was incurred on an unsecured basis.

38.     Between 2006 and 2013, Peabody did not pledge any collateral in connection with any credit agreement.

39.     In October 2006, August 2010 and November 2011, Peabody issued each respective series of Unsecured Notes.  Each Unsecured Notes Indenture contains a qualified prohibition against Peabody incurring additional debt on a secured basis.

**1.     PERMITTED-LIEN COVENANTS; EQUAL AND RATABLE CLAUSES**

40.     Each Unsecured Notes Indenture contains a specific covenant limiting Peabody's ability to maintain (at any particular time) or incur secured debt.  That covenant prohibits Peabody from maintaining (at any particular time) or incurring debt secured by liens on Principal Property unless the Unsecured Notes receive an "equal and ratable" pledge of collateral securing Peabody's obligations with respect to the Unsecured Notes.  There is a limited exception: Peabody can have debt secured by liens on Principal Property without triggering the requirement to provide equal and ratable collateral if the amount of debt secured by liens on Principal Property does not exceed 15% of CNTA.

41.     Section 4.06 of the 2021 & 2018 Notes Indenture is representative of this covenant as it appears in the Unsecured Notes Indentures (collectively, the "Permitted-Liens Covenants"):

> **Section 4.06.  Liens.**  Except as otherwise provided below pursuant to this Section 4.06, the Company shall not . . . issue, incur . . . or otherwise have outstanding any Indebtedness secured by any . . . lien . . . each a 'Lien' and collectively 'Liens,' upon any Principal Property or shares of Capital Stock or Indebtedness … unless the Notes . . . are secured equally and ratably with . . . such secured Indebtedness . . . .  [T]he Company . . . may issue, incur . . . Indebtedness secured by a Lien which would otherwise be subject to the foregoing restrictions without equally and ratably securing the notes, ***provided that after giving effect to the Indebtedness secured by such Lien, the aggregate principal amount of all Indebtedness so secured by Liens . . . and the Attributable Debt of Sale and Lease-Back Transactions . . . does not exceed 15% of Consolidated Net Tangible Assets***.

2021 & 2018 Notes Indenture at 28–29 (§ 4.06) (emphasis added); 2026 Notes Indenture at 17 (§ 4.12); 2020 Unsecured Indenture at 17 (§ 4.12).

42.    The Unsecured Notes Indentures define CNTA as follows:

> 'Consolidated Net Tangible Assets' means, as of any particular time, the total of all the assets appearing on the most recent consolidated balance sheet prepared in accordance with GAAP of the Company and its Subsidiaries as of the end of the last fiscal quarter for which financial information is available (less applicable reserves and other properly deductible items) after deducting from such amount:

> (a) all current liabilities, including current maturities of long-term debt and current maturities of obligations under capital leases (other than any portion thereof maturing after, or renewable or extendable at the option of the Company or the relevant Subsidiary beyond, twelve months from the date of determination); and

> (b) the total of the net book values of all assets of the Company and its Subsidiaries properly classified as intangible assets under GAAP (including goodwill, trade names, trademarks, patents, unamortized debt discount and expense and other like intangible assets).

2021 & 2018 Notes Indenture at 3 (§ 1.01 (Definitions)) (emphasis added); 2026 Notes Indenture at 2 (§ 1.01); 2020 Notes Indenture at 3 (§ 1.01).

43.     The Unsecured Notes Indentures define "Principal Property" to mean "any real property interests . . . including any mining claims and leases, and any plants, buildings or other improvements thereon, and any part thereof, located in the United States that is held by the Company or any Restricted Subsidiary and has a gross book value (without deduction of any depreciation reserves), on the date as of which the determination is being made, exceeding 1% of Consolidated Net Tangible Assets . . . ." <u>See</u> 2021 & 2018 Notes Indenture at 5 (§ 1.01 (Definitions)); 2026 Notes Indenture at 5 (§ 1.01); 2020 Notes Indenture at 5 (§ 1.01).

44.     Each prospectus issued with respect to each series of Unsecured Notes mentioned the Permitted-Liens Covenant.

45.     The Unsecured Notes Indentures are governed by Rules of Construction that state, in relevant part, that "[u]nless the context otherwise requires . . . (2) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP." <u>See</u> 2021 & 2018 Notes Indenture at 10 (§ 1.04); 2026 Notes Indenture at 8 (§ 1.04); 2020 Notes Indenture at 8 (§ 1.04).

## 2.    <u>AUTOMATIC ACCELERATION PROVISIONS</u>

46.     Peabody's chapter 11 filing constitutes an "Event of Default" under each Unsecured Notes Indenture. <u>See</u>, <u>e.g.</u>, 2021 & 2018 Notes Indenture at 32 (§ 6.01) ("An 'Event of Default' with respect to any series of Notes (and for purposes of this Indenture) occurs if . . . (g) the Company . . . (i) commences a voluntary case"); <u>see also</u> 2026 Notes Indenture at 21 (§ 6.01); 2020 Notes Indenture at 21 (§ 6.01).

47.     Each Unsecured Notes Indenture contains a provision that automatically accelerates the debt upon a bankruptcy filing and makes it immediately due and payable.  It provides that "if an Event of Default specified in (g) [of Section 6.01 hereof, <u>i.e.</u>, commencement of voluntary case] occurs, all Outstanding Notes shall become due and payable without further

14

action or notice." See 2021 & 2018 Notes Indenture at 32 (§ 6.02); see also 2020 Notes Indenture at 22 (§ 6.02); 2026 Notes Indenture at 22 (§ 6.02).

48.    Peabody's chapter 11 filing constitutes an "Event of Default" under the 2066 Subordinated Notes Indenture. See 2066 Subordinated Notes Indenture at 25 (§ 2.11(a)(iv)); Subordinated Notes Base Indenture at 22–23 (§ 5.01(e)). The 2066 Subordinated Notes Indenture also contains a provision that automatically accelerates and makes immediately due and payable the outstanding principal amount of the notes upon a chapter 11 filing. See Subordinated Notes Base Indenture at 23–24 (§ 5.02).

### C.    2013: AT CITIBANK'S SUGGESTION, PEABODY PLEDGES CERTAIN NON-PRINCIPAL PROPERTY TO AVOID VIOLATING PERMITTED-LIEN COVENANTS

49.    Peabody collateralized debt for the first time in seven years when it entered into the 2013 Credit Agreement on September 23, 2013. Because the Unsecured Notes Indentures were in place at the time Peabody negotiated and executed the 2013 Credit Agreement, that credit agreement had to comply with the Permitted-Liens Covenants. If liens were granted with respect to Principal Property, then the Permitted-Liens Covenants required that the Unsecured Notes would receive an equal and ratable collateral pledge.

50.    Peabody pledged certain assets that were not Principal Property to secure its obligations under the 2013 Credit Agreement, specifically 65% of the stock of Peabody Gibraltar and the 100% of the stock of Peabody IC Funding (the "2013 Agreement Collateral").

51.    Peabody did not pledge any Principal Property—or any other collateral apart from the stock pledges—as security for its obligations under the 2013 Credit Agreement.

52.    Under the 2013 Credit Agreement, the lenders made $2.85 billion available, and Peabody's repayment obligations were secured exclusively by the 2013 Agreement Collateral.

### D.   2015:  PEABODY GRANTS A FLOATING LIEN WITH RESPECT TO PRINCIPAL PROPERTY UNDER FIRST-LIEN CREDIT AGREEMENT

53.      On February 5, 2015, Peabody and Citibank amended the 2013 Credit Agreement through the Omnibus Amendment Agreement.  The amended 2013 Credit Agreement (i.e., now the First-Lien Credit Agreement) contained certain modified covenants and additional collateral pledges—but did not provide for any additional money.  The First-Lien Lenders did not extend any additional loans under the First-Lien Credit Agreement beyond those extended under the 2013 Credit Agreement.  They did, however, receive a significantly improved collateral package.

#### 1.   COLLATERAL GRANT

54.      In exchange for the covenant relief, the First-Lien Lenders received additional collateral through pledges that were tailored to avoid violating the Permitted-Lien Covenants in the Unsecured Notes Indentures, specifically:

    a)  stock pledges from PEC subsidiaries, including a 65% stock pledge of first-tier foreign subsidiaries, and a 100% stock pledge of U.S. subsidiaries;

    b)  real and personal property assets located in the United States that do not meet the definition of Principal Property (the "Non-Principal Property"); and

    c)  Principal Property—subject to the Principal Property Cap (collectively, (a)-(c), the "Collateral").

55.      Because granting unrestricted liens with respect to Principal Property would have violated Permitted-Liens Covenants, a "floating lien" concept was proposed with respect to Principal Property in connection with the First-Lien Credit Agreement.  Specifically, the amount of indebtedness secured by Principal Property pledged under the First-Lien Credit Agreement is subject to the Principal Property Cap.  The Principal Property Cap adjusts continuously and automatically so that *at all times* the debt secured by Principal Property will never exceed the restrictions imposed in the Permitted-Lien Covenants.

56.      Under the First-Lien Credit Agreement, Principal Property "means, with respect to any Reference Indenture . . . 'Principal Property' or any functionally equivalent term as

defined in any Reference Indenture in effect on such date; provided, that term 'Principal Property' (or its functional equivalent) as used in any such Reference Indenture and the property constituting 'Principal Property' (or its functional equivalent) therein shall not be expanded relative to the term 'Principal Property' or the property encompassed by the definition of 'Principal Property' under any Reference Indenture as in effect on the Amendment Effective Date unless such expansion is immaterial to the Lenders' collateral coverage and approved by the Administrative Agent."  First-Lien Credit Agreement § 1.01 (Defined Terms).

57.    The First-Lien Credit Agreement provides the following with respect to the negative covenants set forth in Article VII:  "[f]or purposes of determining whether the Borrower and its Restricted Subsidiaries comply with any exception to Section 7.01, Section 7.02 and 7.03 (including Sections 7.01(w), 7.02(l), 7.02(m) and 7.03(l)) where compliance with any such exception is based on a financial ratio or metric being satisfied, it is understood that . . . compliance shall be measured at the time when the relevant event is undertaken, as such financial ratios and metrics are intended to be 'incurrence' tests and not 'maintenance' tests . . . ."  First-Lien Credit Agreement § 1.09 (Negative Covenant Compliance).

58.    The Principal Property Covenant is not a negative covenant contained in Article VII of the First-Lien Credit Agreement.  Instead, it is an affirmative covenant contained in Article VI, specifically section 6.16(g):

> (g) Limit on Amount of Secured Obligations Secured by Principal Property and Specified Capital Stock and Indebtedness. Notwithstanding anything to the contrary in any Loan Document . . . to the extent that any portion of the Collateral consists of Principal Property or Specified Capital Stock and Indebtedness, (i) *the aggregate amount of Specified First Lien Obligations constituting Specified Indebtedness secured by Liens on Principal Property or Specified Capital Stock and Indebtedness at any time shall be limited, automatically and without further action by any Person, so that such amount does not exceed the Principal Property Cap at such time . . . .*

First-Lien Credit Agreement § 6.16(g) (emphasis added).

17

59.    The plain language of the Principal Property Covenant provides a test by which

the first-lien obligations that are secured by Principal Property—at all times—do not exceed 15%

of CNTA.  The restriction is calculated with reference to the Principal Property Cap:

> "Principal Property Cap" means, as of the date of determination,
> with respect to a Lien securing Specified Indebtedness, *15% of
> Specified Consolidated Net Tangible Assets as determined on
> such date under the applicable Reference Indenture* minus the
> sum of (a) $50,000,000 and (b) solely in the event that any
> Specified Indebtedness exists on the Amendment Effective Date
> that is secured by Principal Property or Specified Capital Stock and
> Indebtedness (other than any Specified First Lien Obligations), the
> amount of such Specified Indebtedness, but not to exceed
> $25,000,000 in the aggregate . . . .

See First-Lien Credit Agreement § 1.01 (Defined Terms) (emphasis added).

60.    The First-Lien Credit Agreement defines "Specified Consolidated Net Tangible

Assets" as follows:

> 'Specified Consolidated Net Tangible Assets' means, with respect to any Reference
> Indenture (and any series of Specified Indebtedness issued thereunder), as of any date of
> determination, 'Consolidated Net Tangible Assets' or any functionally equivalent term as
> defined in any Reference Indenture in effect on such date; provided, that, the term
> 'Consolidated Net Tangible Assets' (or its functional equivalent) as used in any such
> Reference Indenture shall not be modified to the extent that the amount of 'Consolidated
> Net Tangible Assets' (or its functional equivalent) calculated thereunder would be less
> than the least of any amount calculated under the definition of 'Consolidated Net
> Tangible Assets' under any Reference Indenture as in effect on the Amendment Effective
> Date (unless such modification to the definition of 'Consolidated Net Tangible Assets' is
> approved by the Administrative Agent and the amount of such reduction is immaterial to
> the Lenders' collateral coverage).

See First Lien Credit Agreement § 1.01 (Defined Terms).

61.    Under the Pledge Agreement, the Peabody Plaintiffs (each of whom is a Grantor

under that agreement) granted security interests with respect to the Collateral.  See Pledge

Agreement § 2(a) ("Each Grantor hereby grants to the Administrative Agent, for the benefit of

the Secured Parties, a security interest in, all of the following property …"); id. at 27 (listing

"Grantors" to include PEC, signatories, and "each Subsidiary Party listed on Schedule 1 hereto").

62.    The Pledge Agreement makes clear that "[f]or the avoidance of doubt, this Agreement is subject to the provisions of 6.16(g) . . . of the Credit Agreement, including the application of the Principal Property Cap to Secured Obligations constituting Specified Indebtedness that are secured by any portion of the Collateral Consisting of Principal Property or Specified Capital Stock and Indebtedness as set forth herein."  Pledge Agreement at 8 (§ 2(c)).

63.    The Principal Property Cap applies to all "Specified Indebtedness."  The First Lien Credit Agreement defines "<u>Specified Indebtedness</u>" to mean "with respect to any Reference Indenture, any series of Specified Indebtedness issued thereunder, 'Indebtedness' (or its functional equivalent) as used in any such Reference Indenture and the categories of indebtedness constituting 'Indebtedness' (or its functional equivalent) therein shall not be expanded relative to the term 'Indebtedness' or the indebtedness encompassed by the definition of 'Indebtedness' under any Reference Indenture as in effect on the Amendment Effective Date unless such expansion is immaterial to the Lenders' collateral coverage and approved by the Administrative Agent."  First-Lien Credit Agreement § 1.01 (Defined Terms).

64.    The Unsecured Notes Indentures define "Indebtedness" broadly.  <u>See</u> 2021 & 2018 Notes Indenture at 5 (§ 1.01) ("Indebtedness means, with respect to any Person, any indebtedness of such Person, whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments."); 2026 Notes Indenture at 4 (§ 1.01) (same); 2020 Notes Indenture at 4 (§1.01) (same).

## 2.    <span style="font-variant: small-caps">Events Of Default And Acceleration</span>

65.    Under the First-Lien Credit Agreement, Peabody's submission of financial statements that are subject to going-concern qualifications gives rise to an Event of Default (as defined) if not cured within 30 days.  <u>See</u> First-Lien Credit Agreement § 6.01(a) (Peabody covenants to "[d]eliver to the Administrative Agent and each Lender . . . (a) . . . within 90 days after the end of each fiscal year of the Borrower . . . a consolidated balance sheet . . . setting forth

19

in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP; such consolidated statements shall be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any 'going concern' or like qualification or exception or any qualification or exception as to the scope of such audit."); id. § 8.01(c) (defining the following as an Event of Default:  "[a]ny Loan Party fails to perform or observe any other covenant or agreement . . . contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days").

66.    Peabody's commencement of the Bankruptcy Cases constituted an "Event of Default."  See First-Lien Credit Agreement § 8.01(f) ("Any of the following shall constitute an Event of Default . . . (f) any Loan Party or any of its Restricted Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law.").

67.    Upon the filing of the Bankruptcy Cases, the debt outstanding under the First-Lien Credit Agreement was accelerated automatically under the terms of that agreement.  See First-Lien Credit Agreement § 8.02 ("[U]pon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under Debtor Relief Laws of the United States, the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.").

### E.   2015:  PEABODY ISSUES SECOND-LIEN NOTES

68.     On March 15, 2015, Peabody issued the Second-Lien Notes pursuant to the

Second-Lien Notes Indenture (a copy of which is attached as Exhibit E (without schedules and

exhibits)).

69.     Peabody's obligations with respect to the Second-Lien Notes are secured by

second-priority liens on the Collateral which are junior to the first-priority liens granted in favor

of the First-Lien Lenders with respect to the obligations under the First-Lien Credit Agreement,

subject to permitted liens and other limitations.  The First-Lien Lenders and holders of Second-

Lien Notes are parties to an inter-creditor agreement.  See Second-Lien Notes Indenture § 11.01

("Each Holder, by accepting a Note agrees that the Second Priority Liens securing the Notes and

the Subsidiary Guarantees are subject to the terms of the Intercreditor Agreement"); id. § 12.01

("The Notes and the Subsidiary Guarantees are secured as provided in the Security Documents

and will be secured by Security Documents hereinafter delivered as required by this Indenture.").

70.     The Second-Lien Notes Indenture contains the same definitions of "Principal

Property" and "Principal Property Cap" that appear in the First-Lien Credit Agreement.  See

Second-Lien Notes Indenture § 1.01 (Definitions).

71.     The Second-Lien Notes Indenture also contains the same Principal Property

Covenant that appears in the First-Lien Credit Agreement.  See Second-Lien Notes Indenture

§ 4.12(g) ("Principal Properties Cap; Priorities").

72.     Under the Second-Lien Indenture, Peabody's bankruptcy filing constituted an

"Event of Default" that automatically accelerated all obligations with respect to the Second-Lien

Notes and made those amounts immediately due and payable.  See Second-Lien Notes Indenture

§ 6.01(g) ("An 'Event of Default' with respect to the Notes (and for purposes of this Indenture)

occurs if . . . (g) the Company . . . (i) commences a voluntary case . . . ."); id. § 6.02 ("[I]f an

Event of Default specified in (g) or (h) of Section 6.01 hereof occurs, all Outstanding Notes shall

become due and payable without further action or notice.").

F.     **2016: E&Y AUDIT OPINION; BANKRUPTCY FILING**

73.     On March 16, 2016, Peabody submitted its 2015 Form 10-K for the fiscal year

ending December 31, 2015 to the SEC, which included the E&Y Audit Opinion.  In addition to

expressing "substantial doubt about the Company's ability to meet its obligations as they become

due within one year after the date of this report and continue as a going concern," Ernst & Young

noted "[t]he consolidated financial statements do not include any adjustments that might result

from the outcome of this uncertainty, other than ***the reclassification of long-term debt and the

related debt issuance costs to current liabilities and current assets, respectively.***" (emphasis

added).

74.     In the 2015 Form 10-K, Peabody announced that it had elected to exercise the 30-

day grace period with respect to a $21.1 million semi-annual interest payment due March 15,

2016 for the 2020 Unsecured Notes and a $50.0 million semi-annual interest payment due March

15, 2016 on the Second-Lien Notes.  Failure to pay these interest amounts on March 15, 2016 did

not constitute an immediate Event of Default under the indentures governing these notes, but

would have become an Event of Default if the payment were not made within 30 days of such

date.

75.     In the 2015 Form 10-K, Peabody also announced that the First-Lien Credit

Agreement and its governing documents contain covenants that, among other things, required

Peabody to furnish audited financial statements within 90 days after the fiscal year without a

"going concern" uncertainty paragraph in the auditor's opinion.  The consolidated financial

statements for the year ended December 31, 2015 contained in the 2015 Form 10-K included a

"going concern" paragraph contained in the E&Y Audit Opinion.

76.     Based upon Peabody's then-current financial situation, GAAP required Peabody

to classify its long-term debt as current liabilities in the 2015 Form 10-K.  In the 2015 Form 10-

K, the consolidated balance sheet lists "Total current liabilities" of $7,392.3 million and "Current

portion of long-term debt" of $5,930.4 million, as of December 31, 2015. A copy of the relevant portions of the 2015 Form 10-K is attached hereto as Exhibit C.

77.    On the Petition Date (April 13, 2016), Peabody commenced the Bankruptcy Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in this Court.

78.    Peabody's bankruptcy filing triggered the automatic acceleration provisions in each of the First-Lien Credit Agreement, the Second-Lien Notes Indenture, the Unsecured Notes Indentures, and the 2066 Notes Indenture, accelerating the maturity date and making the principal amount of Peabody's obligations, and all accrued and unpaid interest under those agreements immediately due and payable.

79.    The DIP Credit Agreement acknowledges the existence of this dispute. It defines these issues as the "CNTA Issues," defines this dispute as the "CNTA Dispute," and demands that Peabody submit the dispute for the Court's decision within 30 days of the Petition Date, a deadline that was extended by agreement until May 23, 2016. See DIP Financing Agreement at 94 (§ 6.19(c)) (covenanting that "[w]ith respect to the CNTA Dispute and the CNTA Issues: (i) not later than the date that is thirty (30) days following the Petition Date, the Borrower (without prejudice to the rights of any other Person to commence such an action or any other proceeding) shall commence a declaratory judgment action seeking a determination of the effect of Section 6.16(g) of the Existing Credit Agreement on the extent of the secured claims of the Existing Credit Agreement Lenders under the Existing Credit Agreement in respect of the Principal Property, and which of the U.S. Mine complexes are Principal Property such issues, the 'CNTA Issues' and such litigation, the 'CNTA Dispute') and (ii) not later than the date that is one-hundred eighty (180) days following the Petition Date, the Bankruptcy Court shall have entered an order determining the CNTA Issues.").

23

80.     On May 6, 2016, Peabody filed its first quarter Form 10-Q (the "March 2016 Form 10-Q") which included its last consolidated balance sheets before the Petition Date, i.e., for the first quarter ending March 31, 2016.  The March 2016 Form 10-Q lists "Total current liabilities" of $8,124.4 million, which includes "Current portion of long-term debt" of $6,820.2 million, as of March 31, 2016.  A copy of the relevant portions of the March 2016 Form 10-Q is attached hereto as Exhibit D.

## COUNT I

### DECLARATORY JUDGMENT

**(Principal Property Covenant Is Maintenance Covenant;
Principal Property Cap Is Calculated By Including Long-Term Debt
Classified As Current Liabilities Under GAAP)**

81.     Peabody hereby incorporates by reference paragraphs 1 through 80 inclusive, as if fully set forth herein.

82.     This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

83.     A dispute exists between Peabody and its Secured Creditors, including Citibank, Wilmington Bank, the First-Lien Lenders and the holders of the Second-Lien Notes (collectively, the "Secured Creditors"), with respect to the calculation of the Principal Property Cap and the extent of the Secured Creditors' liens on Principal Property, giving rise to an actual and justiciable controversy.

84.     The Permitted-Lien Covenants entitle Peabody to maintain (at any particular time) or incur debt secured by liens on Principal Property without equally and ratably securing the debt—but only so long as the amount of that debt does not exceed 15% of CNTA.

85.     Under the plain terms of the First-Lien Credit Agreement and the Second-Lien Notes Indenture, compliance with the Principal Property Covenant is measured using a maintenance test that applies automatically and continuously, "at any time"—so that the amount

of debt secured by Principal Property will never exceed the limitations in the Permitted Liens Covenants.

86.    The Rules of Construction provision in the Unsecured Notes Indentures provide that an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP.

87.    Under the plain terms of the Unsecured Notes Indenture, the phrase "current liabilities" is an accounting term and, as used in CNTA, is interpreted in accordance with GAAP.

88.    Without exception, Peabody's long-term debt that is classified as current liabilities under GAAP is included when calculating the Principal Property Cap and CNTA.

89.    The Principal Property Cap applies to all Specified Indebtedness, which includes any and all amounts owing in respect of the First-Lien Credit Agreement and the Second-Lien Notes Indenture, including, without limitation, obligations relating to letters of credit and swap agreements.

90.    Accordingly, the Court should declare that (a) compliance with the Principal Property Covenant is a measured using a maintenance test; (b) without exception, Peabody's long-term debt that is classified as current liabilities under GAAP counts for purposes of calculating the Principal Property Cap and CNTA; (c) Specified Indebtedness subject to the Principal Property Cap includes any and all amounts owing in respect of the First-Lien Credit Agreement and the Second-Lien Notes Indenture; and (d) the Principal Property Cap is an amount not greater than $505 million.

## COUNT II

### DECLARATORY JUDGMENT

### (U.S. Properties Constitute Principal Property)

91.    Peabody hereby incorporates by reference paragraphs 1 through 90 inclusive, as if fully set forth herein.

92.     This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

93.     A dispute exists between Peabody and its Secured Creditors with respect to which of the U.S. Properties constitute Principal Property, giving rise to an actual and justiciable controversy.

94.     The First-Lien Credit Agreement defines Principal Property to mean real property (mines and reserves) located in the United States with a gross book value exceeding 1% of CNTA.

95.     Under the plain language of the First-Lien Credit Agreement and the Second-Lien Indenture, Peabody's long-term debt that is classified as current liabilities under GAAP is included for purposes of calculating the Principal Property Cap and CNTA.

96.     Including long-term debt in these calculations (a) lowers the threshold value for U.S. Properties to be included as Principal Property and (b) therefore expands the universe of U.S. Property that otherwise might constitute fully-encumbered Non-Principal Property—but that nonetheless now satisfies the Principal Property definition (i.e., 1% of CNTA) and becomes subject to the Principal Property Cap.

97.     Accordingly, the Court should declare that the U.S. Properties set forth on Schedule 2 hereto constitute Principal Property for purposes of the Principal Property Cap.

## **PRAYER FOR RELIEF**

WHEREFORE, Peabody respectfully requests that this Court enter an Order:

A.  declaring that compliance with the Principal Property Covenant is measured using a maintenance test that applies automatically and continuously, "at any time;"

B.  declaring that Specified Indebtedness subject to the Principal Property Cap includes any and all amounts owing in respect of the First-Lien Credit Agreement and the Second-Lien Notes Indenture, including letter of credit and swap agreement obligations;

C.  declaring that without exception, Peabody's long-term debt that is classified as current liabilities in accordance with GAAP is included for purposes of calculating the Principal Properties Cap and CNTA;

D.  declaring that the Principal Property Cap is an amount not greater than $505 million;

E.  declaring that the U.S. Properties set forth on Schedule 2 hereto constitute Principal Property; and

F.  awarding such other and further relief as the Court may deem just and proper.


*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated:  May 20, 2016                    */s/ Steven N. Cousins*

Steven N. Cousins, MO  30788
Susan K. Ehlers, MO 49855
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO  63105
Telephone:  (314) 621-5070
Facsimile:  (314) 612-2239
Email:  scousins@armstrongteasdale.com
Email:  sehlers@armstrongteasdale.com

*Counsel to Peabody Energy Corporation and its Affiliated
Debtors and Debtors In Possession*


Richard I. Werder, Jr. (pro hac vice to be filed)
James C. Tecce (pro hac vice to be filed)
Corey Worcester (pro hac vice to be filed)
Brian Campbell (pro hac vice to be filed)
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone:  (212) 849 7000
Facsimile:  (212) 849-7100

*Proposed Special Counsel to Peabody Energy Corporation and
its Affiliated Debtors and Debtors In Possession*

## SCHEDULE 1

### Schedule of Additional Peabody Plaintiffs (Grantors under Pledge Agreement)

| Name | State of Incorporation | Principal Place of Business |
|---|---|---|
| American Land Development, LLC | Delaware | Missouri |
| American Land Holdings of Colorado, LLC | Delaware | Missouri |
| American Land Holdings of Illinois, LLC | Delaware | Missouri |
| American Land Holdings of Indiana, LLC | Delaware | Missouri |
| American Land Holdings of Kentucky, LLC | Delaware | Missouri |
| American Land Holdings of New Mexico, LLC | Delaware | Missouri |
| American Land Holdings of West Virginia, LLC | Delaware | Missouri |
| Arid Operations Inc. | Delaware | Colorado |
| Big Ridge, Inc. | Illinois | Illinois |
| Black Hills Mining Company, LLC | Illinois | Missouri |
| BTU Western Resources, Inc. | Delaware | Missouri |
| Caballo Grande, LLC | Delaware | Missouri |
| Caseyville Dock Company, LLC | Delaware | Missouri |
| Central States Coal Reserves of Illinois, LLC | Delaware | Missouri |
| Central States Coal Reserves of Indiana, LLC | Delaware | Missouri |
| Century Mineral Resources, Inc. | Illinois | Missouri |
| Coal Reserve Holding Limited Liability Company No. 1 | Delaware | Missouri |
| COALSALES II, LLC | Delaware | Missouri |
| Colorado Yampa Coal Company | Delaware | Missouri |
| Conservancy Resources, LLC | Delaware | Missouri |
| Cottonwood Land Company | Delaware | Missouri |
| Cyprus Creek Land Company | Delaware | Missouri |
| Cyprus Creek Land Resources, LLC | Delaware | Missouri |
| Dyson Creek Coal Company, LLC | Delaware | Missouri |
| Dyson Creek Mining Company, LLC | Delaware | Missouri |
| El Segundo Coal Company, LLC | Delaware | Missouri |
| Empire Land Holdings, LLC | Delaware | Missouri |
| Falcon Coal Company, LLC | Indiana | Indiana |
| Francisco Equipment Company, LLC | Delaware | Missouri |
| Francisco Land Holdings Company, LLC | Delaware | Missouri |
| Francisco Mining, LLC | Delaware | Missouri |
| Gallo Finance Company | Delaware | Missouri |
| Gold Fields Chile, LLC | Delaware | Colorado |
| Gold Fields Mining, LLC | Delaware | Colorado |

| | | |
|---|---|---|
| Gold Fields Ortiz, LLC | Delaware | Colorado |
| Hayden Gulch Terminal, LLC | Delaware | Missouri |
| Highwall Mining Services Company | Delaware | Missouri |
| Hillside Recreational Lands, LLC | Delaware | Missouri |
| HMC Mining, LLC | Delaware | Missouri |
| Illinois Land Holdings, LLC | Illinois | Missouri |
| Independence Material Handling, LLC | Delaware | Missouri |
| James River Coal Terminal, LLC | Delaware | Missouri |
| Juniper Coal Company | Delaware | Missouri |
| Kayenta Mobile Home Park, Inc. | Delaware | Arizona |
| Kentucky Syngas, LLC | Delaware | Missouri |
| Lively Grove Energy, LLC | Delaware | Missouri |
| Lively Grove Energy Partners, LLC | Delaware | Missouri |
| Marigold Electricity, LLC | Delaware | Missouri |
| Midco Supply and Equipment Corporation | Illinois | Missouri |
| Midwest Coal Acquisition Corp. | Delaware | Missouri |
| Midwest Coal Reserves of Illinois, LLC | Delaware | Missouri |
| Midwest Coal Reserves of Indiana, LLC | Delaware | Missouri |
| Moffat County Mining, LLC | Delaware | Missouri |
| Mustang Energy Company, L.L.C. | Delaware | Missouri |
| New Mexico Coal Resources, LLC | Delaware | Missouri |
| NM Equipment Company, LLC | Delaware | Missouri |
| Pacific Export Resources, LLC | Delaware | Missouri |
| Peabody America, Inc. | Delaware | Missouri |
| Peabody Archveyor, L.L.C. | Delaware | Missouri |
| Peabody Arclar Mining, LLC | Indiana | Illinois |
| Peabody Bear Run Mining, LLC | Delaware | Missouri |
| Peabody Bear Run Services, LLC | Delaware | Missouri |
| Peabody Caballo Mining, LLC | Delaware | Wyoming |
| Peabody Cardinal Gasification, LLC | Delaware | Missouri |
| Peabody COALSALES, LLC | Delaware | Missouri |
| Peabody COALTRADE, LLC | Delaware | Missouri |
| Peabody COALTRADE International (CTI), LLC | Delaware | Missouri |
| Peabody Colorado Operations, LLC | Delaware | Missouri |
| Peabody Colorado Services, LLC | Delaware | Missouri |
| Peabody Coulterville Mining, LLC | Delaware | Missouri |
| Peabody Development Company, LLC | Delaware | Missouri |
| Peabody Electricity, LLC | Delaware | Missouri |
| Peabody Employment Services, LLC | Delaware | Missouri |
| Peabody Energy Generation Holding Company | Delaware | Missouri |

| | | |
|---|---|---|
| Peabody Energy Investments, Inc. | Delaware | Missouri |
| Peabody Energy Solutions, Inc. | Delaware | Missouri |
| Peabody Gateway North Mining, LLC | Delaware | Missouri |
| Peabody Gateway Services, LLC | Delaware | Missouri |
| Peabody Holding Company, LLC | Delaware | Missouri |
| Peabody Illinois Services, LLC | Delaware | Missouri |
| Peabody Indiana Services, LLC | Delaware | Missouri |
| Peabody International Investments, Inc. | Delaware | Missouri |
| Peabody International Services, Inc. | Delaware | Missouri |
| Peabody Magnolia Grove Holdings, LLC | Delaware | Missouri |
| Peabody Midwest Management Services, LLC | Delaware | Missouri |
| Peabody Midwest Mining, LLC | Indiana | Indiana |
| Peabody Midwest Operations, LLC | Delaware | Missouri |
| Peabody Midwest Services, LLC | Delaware | Missouri |
| Peabody Natural Gas, LLC | Delaware | Missouri |
| Peabody Natural Resources Company | Delaware | Missouri |
| Peabody New Mexico Services, LLC | Delaware | Missouri |
| Peabody Operations Holding, LLC | Delaware | Missouri |
| Peabody Powder River Mining, LLC | Delaware | Wyoming |
| Peabody Powder River Operations, LLC | Delaware | Missouri |
| Peabody Powder River Services, LLC | Delaware | Missouri |
| Peabody PowerTree Investments, LLC | Delaware | Missouri |
| Peabody Recreational Lands, L.L.C. | Delaware | Missouri |
| Peabody Rocky Mountain Management Services, LLC | Delaware | Missouri |
| Peabody Rocky Mountain Services, LLC | Delaware | Missouri |
| Peabody School Creek Mining, LLC | Delaware | Missouri |
| Peabody Services Holdings, LLC | Delaware | Missouri |
| Peabody Southwest, LLC | Delaware | Missouri |
| Peabody Southwestern Coal Company | Delaware | Missouri |
| Peabody Terminal Holding Company, LLC | Delaware | Missouri |
| Peabody Terminals, LLC | Delaware | Missouri |
| Peabody Trout Creek Reservoir LLC | Delaware | Missouri |
| Peabody Venezuela Coal Corp. | Delaware | Missouri |
| Peabody Venture Fund, LLC | Delaware | Missouri |
| Peabody-Waterside Development, L.L.C. | Delaware | Missouri |
| Peabody Wild Boar Mining, LLC | Delaware | Missouri |
| Peabody Wild Boar Services, LLC | Delaware | Missouri |
| Peabody Williams Fork Mining, LLC | Delaware | Missouri |
| Peabody Wyoming Gas, LLC | Delaware | Missouri |
| Peabody Wyoming Services, LLC | Delaware | Missouri |

| PEC Equipment Company, LLC | Delaware | Missouri |
|---|---|---|
| Point Pleasant Dock Company, LLC | Delaware | Missouri |
| Pond River Land Company | Delaware | Missouri |
| Porcupine Production, LLC | Delaware | Missouri |
| Porcupine Transportation, LLC | Delaware | Missouri |
| Riverview Terminal Company | Delaware | Missouri |
| Sage Creek Land & Reserves, LLC | Delaware | Missouri |
| School Creek Coal Resources, LLC | Delaware | Missouri |
| Shoshone Coal Corporation | Delaware | Missouri |
| Star Lake Energy Company, L.L.C. | Delaware | Missouri |
| Sugar Camp Properties, LLC | Indiana | Indiana |
| Thoroughbred Generating Company, LLC | Delaware | Missouri |
| Thoroughbred Mining Company, L.L.C. | Delaware | Missouri |
| Twentymile Coal, LLC | Delaware | Colorado |
| Twentymile Holdings, LLC | Delaware | Missouri |
| West Roundup Resources, LLC | Delaware | Missouri |
| Wild Boar Equipment Company, LLC | Delaware | Missouri |
| Wild Boar Land Holdings Company, LLC | Delaware | Missouri |
| Big Sky Coal Company | Delaware | Missouri |
| Peabody Investments Corp. | Delaware | Missouri |
| Peabody Sage Creek Mining, LLC | Delaware | Missouri |
| Peabody Twentymile Mining, LLC | Delaware | Missouri |
| Peabody Western Coal Company | Delaware | Arizona |
| Sage Creek Holdings, LLC | Delaware | Missouri |
| Seneca Coal Company, LLC | Delaware | Missouri |

## SCHEDULE 2

### U.S. Properties That Constitute Principal Property

| U.S. Real Property |
|---|
| North Antelope/Rochelle |
| Caballo |
| Kayenta |
| Bear Run |
| Twentymile |
| Rawhide |
| Elkton Reserves |
| Lee Ranch |
| Somerville Central |
| El Segundo |
| Gateway North |
| Carlyle Reserves |
| Area S. of Mine No. 17 Reserves |
| Somerville UMC |
| Bond County, IL Reserves |
| Francisco |
| Panhandle No. 3, IL Reserves |
| Clear Creek Mine Reserves |
| Pawnee Reserves |
| Star Lake Reserves |
| Gallo Wash Reserves |