## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>PEABODY ENERGY CORPORATION, *et al.*,<br><br>　　　　　　Debtors. | Case No. 16-42529-399<br>CHAPTER 11<br><br>(Jointly Administered) |
| CITIBANK, N.A.,<br><br>　　　　Defendant and<br>　　　　Counterclaim Plaintiff,<br><br>　　v.<br><br>PEABODY ENERGY CORPORATION,<br><br>　　　　Plaintiff and<br>　　　　Counterclaim Defendant. | Adversary Proceeding<br>No. 16-04068 |

## CITIBANK, N.A.'S
## ANSWER AND COUNTERCLAIM FOR DECLARATORY RELIEF

For its answer against Plaintiff and Counterclaim Defendant Peabody Energy Corporation and certain affiliated debtors (collectively, "**Peabody**" or the "**Company**"), Defendant and Counterclaim Plaintiff Citibank, N.A. ("**Citibank**"), as Administrative Agent of the First Lien Credit Agreement[1] and on behalf of the First Lien Lenders (as defined below), responds as follows to the allegations of the Complaint filed May 20, 2016 and further sets forth its Counterclaim seeking declaratory relief:

---

[1] All capitalized terms not otherwise defined have the meanings ascribed to them in the Complaint.

## PRELIMINARY STATEMENT

By its Complaint, and as set forth and defined below, the Debtors have inexplicably adopted a litigation position concerning the proper methodology for determining the amount of collateral securing the claims of the First Lien Lenders that flies in the face of clear contractual language, that directly contradicts their own public filings and statements, and that threatens to embroil the Debtors' estates in value-destroying litigation.

As detailed below, the First Lien Credit Agreement was entered into at a time of severe financial distress for the Debtors.  In exchange for providing vital and necessary financing amendments to a distressed company, the First Lien Lenders negotiated for, and received, a lien on substantially all assets of the Debtors, including a lien on Principal Property, subject to a cap designed to avoid tripping certain equal and ratable sharing provisions in certain pre-existing unsecured bond indentures.  It is the calculation of that cap that is the subject of this dispute.

The Debtors' current position bears no resemblance to what the parties negotiated, is a complete about-face from what the Debtors have publicly represented on numerous occasions, and abandons reason in exchange for a tortured and untenable reading of the relevant contractual provisions.  Indeed, as detailed below and as will be demonstrated in the ensuing litigation of this matter, the Debtors' "position" on this matter is not even their own; rather, the Debtors have abandoned their own prior position (as clearly evidenced by their securities filings and their own statements) in order to adopt the extreme litigation position of certain unsecured professional distressed investors who did not negotiate and are not parties to the First Lien Credit Agreement, and who are willing

to gamble the successful reorganization of the Debtors' estates in an effort to drive up their own recovery at the expense of secured creditors.  By doing so, the Debtors have turned the relevant contract language on its head and have turned their backs on the lenders who provided vital financial support at a time they needed it most by now attempting to deny those lenders the benefit of their bargain.  The Debtors' interpretation leads to an absurdity whereby the First Lien Lenders negotiated for an expansive collateral package that vanishes at the very moment it is needed.  It is a billion-dollar "gotcha."  Accordingly, and for all the reasons set forth below, the First Lien Lenders are entitled to a prompt declaratory judgment in their favor that requires the Debtors to honor the deal that they struck.

## ANSWER

Citibank denies all allegations contained in the Complaint that are not specifically admitted.

1.      Paragraph 1 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 1.

2.      Paragraph 2 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.

3.      Paragraph 3 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 3.

4.      Paragraph 4 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.

5.      Paragraph 5 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 5.

6.      Paragraph 6 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.

7.      Paragraph 7 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.

8.      Paragraph 8 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.

9.      The documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 9 and further denies that Paragraph 9 presents a fair, accurate, and complete characterization of the referenced documents.

10.      The documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies that Paragraph 10 presents a fair, accurate, and complete characterization of the referenced documents.

11.     Citibank is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.  Further, the documents referenced in Paragraph 11 speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 11.

12.     Paragraph 12 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 12 and further denies that Paragraph 12 presents a fair, accurate, and complete characterization of the referenced documents.

13.     Paragraph 13 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 13.

14.     Paragraph 14 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 14.

15.     Paragraph 15 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.

16.     Paragraph 16 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 16.

17.     Paragraph 17 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 17.

18.     Paragraph 18 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 18.

19.     Admitted.

20.     Citibank is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 or in Schedule 1.

21.     Admitted.

22.     Denied.  Citibank is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York 10022.

23.     Admitted.

24.     Paragraph 24 consists of legal conclusions to which no response is required.

25.     Paragraph 25 consists of legal conclusions to which no response is required.

26.     Paragraph 26 consists of legal conclusions to which no response is required.

27.     Paragraph 27 consists of legal conclusions to which no response is required.

28.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.  Citibank further answers that Plaintiff issued the Senior Notes at a rate of 7.785%.

29.     Admitted.

30.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

31.     Admitted.

32.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

33.     Admitted.

34.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

35.     Admitted.

36.     Citibank is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36.

37.     Citibank is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37.

38.     Citibank is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38.

39.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

40.     Paragraph 40 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by

Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 40 and further denies that Paragraph 40 presents a fair, accurate, and complete characterization of the referenced documents.

41.    Paragraph 41 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 41 and further denies that Paragraph 41 presents a fair, accurate, and complete characterization of the referenced documents.

42.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

43.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

44.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

45.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

46.    Paragraph 46 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 46 and further

denies that Paragraph 46 presents a fair, accurate, and complete characterization of the referenced documents.

47.    Paragraph 47 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 47 and further denies that Paragraph 47 presents a fair, accurate, and complete characterization of the referenced documents.

48.    Paragraph 48 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 48 and further denies that Paragraph 48 presents a fair, accurate, and complete characterization of the referenced documents.

49.    Paragraph 49 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.

50.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

51.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

52.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

53.     Paragraph 53 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 53 and further denies that Paragraph 53 presents a fair, accurate, and complete characterization of the referenced documents.

54.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

55.     Paragraph 55 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 55 and further denies that Paragraph 55 presents a fair, accurate, and complete characterization of the referenced documents.

56.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

57.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

58.     Paragraph 58 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 58 and further

denies that Paragraph 58 presents a fair, accurate, and complete characterization of the referenced documents.

59.    Paragraph 59 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 59 and further denies that Paragraph 59 presents a fair, accurate, and complete characterization of the referenced documents.

60.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

61.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 61 and further denies that Paragraph 61 presents a fair, accurate, and complete characterization of the referenced documents.

62.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 62 and further denies that Paragraph 62 presents a fair, accurate, and complete characterization of the referenced documents.

63.    Paragraph 63 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 63 and further

denies that Paragraph 63 presents a fair, accurate, and complete characterization of the referenced documents.

64.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 64 and further denies that Paragraph 64 presents a fair, accurate, and complete characterization of the referenced documents.

65.     Paragraph 65 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 65 and further denies that Paragraph 65 presents a fair, accurate, and complete characterization of the referenced documents.

66.     Paragraph 66 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 66 and further denies that Paragraph 66 presents a fair, accurate, and complete characterization of the referenced documents.

67.     Paragraph 67 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 67 and further

denies that Paragraph 67 presents a fair, accurate, and complete characterization of the referenced documents.

68.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

69.    Paragraph 69 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 69 and further denies that Paragraph 69 presents a fair, accurate, and complete characterization of the referenced documents.

70.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

71.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

72.    Paragraph 72 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 72 and further denies that Paragraph 72 presents a fair, accurate, and complete characterization of the referenced documents.

73.    The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

74.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

75.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

76.     Paragraph 76 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 76 and further denies that Paragraph 76 presents a fair, accurate, and complete characterization of the referenced documents.

77.     Admitted.

78.     Paragraph 78 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 78 and further denies that Paragraph 78 presents a fair, accurate, and complete characterization of the referenced documents.

79.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

80.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

81.     Citibank repeats and incorporates by reference its answers to the allegations in Paragraphs 1 through 80 as though fully set forth herein.

82.    Paragraph 82 consists of legal conclusions to which no response is required.

83.    Paragraph 83 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.

84.    Paragraph 84 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 84 and further denies that Paragraph 84 presents a fair, accurate, and complete characterization of the referenced documents.

85.    Denied.

86.    Paragraph 86 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 86 and further denies that Paragraph 86 presents a fair, accurate, and complete characterization of the referenced documents.

87.    Paragraph 87 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  Further, the documents referenced by Plaintiffs speak for themselves and therefore no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 87 and further denies that Paragraph 87 presents a fair, accurate, and complete characterization of the referenced documents.

88.     Denied.

89.     Paragraph 89 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.  To the extent that a further response is required, Citibank denies the allegations of Paragraph 89.

90.     Paragraph 90 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.

91.     Citibank repeats and incorporates by reference its answers to the allegations in Paragraphs 1 through 90 as though fully set forth herein.

92.     Paragraph 92 consists of legal conclusions to which no response is required.

93.     Paragraph 93 consists of legal conclusions to which no response is required.

94.     The documents referenced by Plaintiffs speak for themselves and therefore no response is required.

95.     Denied.

96.     Paragraph 96 consists of Plaintiffs' characterization of their claims and legal conclusions to which no response is required.

97.     Paragraph 97 consists of legal conclusions to which no response is required.

## **AFFIRMATIVE DEFENSE**

Citibank asserts as a defense that the Complaint fails to state a claim upon which relief can be granted.  For the asserted defense, Citibank does not assume the burden of

proof to the extent such burden is not legally upon Citibank.  Citibank reserves the right to amend its Answer to assert any other defense.

## PRAYER FOR RELIEF

WHEREFORE, Citibank respectfully requests that the Court enter an order dismissing the Complaint, granting judgment in Citibank's favor, awarding costs and attorneys' fees, and granting such other and further relief as the Court deems just and proper.

## COUNTERCLAIM

1.      Citibank brings this Counterclaim seeking a declaratory judgment to resolve a dispute over § 6.16(g) of the First Lien Credit Agreement concerning the Principal Property Cap.

2.      On April 13, 2016 (the "**Petition Date**"), Peabody filed voluntary petitions for relief under Chapter 11 of the United States Code (the "**Bankruptcy**") in the United States Bankruptcy Court in the Eastern District of Missouri (the "**Bankruptcy Court**"). As of the Petition Date, Citibank and other lenders (together with Citibank, the "**First Lien Lenders**") had a first lien security interest in certain properties of the Debtors ("**First Lien**"), including domestic real property above a specified value threshold (the "**Principal Property**").  As of the Petition Date, the amount of the First Lien Lenders' security interest in Principal Property ("**Principal Property First Lien**") is determined by the Principal Property Covenant of the First Lien Credit Agreement.

3.      The language of the relevant provisions of the First Lien Credit Agreement and Reference Indentures is plain and unambiguous on its face.  The First Lien Lenders' interpretation is the only possible interpretation that gives effect to the plain meaning of each word and clause.  As detailed herein, Peabody's interpretation, in

17

contrast, relies on an unreasonable interpretation of the contractual language, ignores key language, and results in a patent absurdity.

4.      As is relevant here, between 2006 and 2011, the Company entered into a series of unsecured senior note indentures—the Reference Indentures. These indentures contain an Equal and Ratable Provision that requires the Company to equally and ratably secure the unsecured noteholders if the Company incurs debt secured by a lien on Principal Property.[2]  However, the Equal and Ratable Provision is not triggered as long as the total Indebtedness secured by such a lien,[3] taking into account the newly incurred debt, "does not exceed 15% of Consolidated Net Tangible Assets."[4]  (Reference Indentures § 4.06.)

5.      Following the issuance of the 2021 & 2018 Notes Indenture, the Company was unable to continue receiving financing on an unsecured basis. The coal market was declining and overabundance of supply caused coal prices to collapse. In 2013, the Company and the First Lien Lenders entered into a credit agreement in which the First Lien Lenders agreed to provide a $1.65 billion Revolving Credit Facility and a $1.20

---

[2] Principal Property is defined as "any real property interests . . . located in the United States that is held by the Company or any restricted Subsidiary and has a gross book value . . . , on the date as of which determination is made, exceeding 1% of Consolidated Net Tangible Assets." (Reference Indentures § 1.01.)  This definition does not include the proceeds of Principal Property.

[3] Indebtedness is defined to mean "with respect to any Person, any indebtedness of such Person, whether or not contingent, in respect of borrowed money or evidenced by bonds, notes, debentures or similar instruments." (Reference Indentures § 1.01.)  This definition does not include swaps, letters of credit, and cash management since they do not qualify as "indebtedness . . . in respect of borrowed money," among other reasons.

[4] Consolidated Net Tangible Assets ("CNTA") is defined as "the total of all the assets appearing on the most recent consolidated balance sheet prepared in accordance with GAAP of the Company and its Subsidiaries as of the end of the last fiscal quarter for which financial information is available . . . after deducting from such amount:  (a) all current liabilities, including current maturities of long-term debt and current maturities of obligations under capital leases (other than any portion thereof maturing after, or renewable or extendable at the option of the Company or the relevant Subsidiary beyond, twelve months from the date of determination)." (Reference Indentures § 1.01.)

billion Term Loan Facility subject to the Company meeting strict financial and

performance ratios and a restriction on incurring future liens (the "**2013 Credit**

**Agreement**").  Proceeds of this agreement were used primarily to pay off the Company's

(1) credit agreement, dated as of June 10, 2010 (as amended, the "**2010 Credit**

**Agreement**"), by and among the Company, Bank of America, N.A., as administrative

agent, swing line lender and L/C issuer, and the other agents and the lenders party thereto,

which had an outstanding principal amount of $301.75 million, and (2) credit agreement,

dated as of October 28, 2011 (as amended, the "**2011 Credit Agreement**"), by and

among the Company, Bank of America, N.A., as administrative agent, and the other

agents and the lenders party thereto, which had an outstanding principal amount of

$862.5 million.  (Form 8-K (Sept. 25, 2013) 2.)  This allowed the Company to push off

all maturing debt to 2016.  In return, the First Lien Lenders received a pledge of 65

percent of Peabody Investments (Gibraltar) Limited, a holding company for Peabody's

Australian operations, and a pledge of the stock of another holding company whose sole

asset was an intercompany receivable.

   6.  Thereafter, the Company's financial condition continued to deteriorate.

By fall 2014, Peabody was at the precipice of defaulting on certain debt and profitability

covenants in the 2013 Credit Agreement, which would trigger an event of default.

Peabody once again approached the First Lien Lenders for relief from a likely default and

the devastating consequences that would surely follow.  In February 2015, the First Lien

Lenders agreed to amend the 2013 Credit Agreement and entered into the First Lien

Credit Agreement.  The revised terms allowed the Company to avoid an event of default,

provided for continued access to liquidity under the First Lien Credit Agreement, and

paved the way for the Company to issue $1 billion in notes the following month.  In return, the First Lien Lenders bargained for an extensive collateral package in compensation for their increased exposure to an ailing company in a distressed industry. A key bargained-for component of the new collateral package was the Principal Property First Lien.

7.     The Principal Property First Lien was designed to avoid triggering the Equal and Ratable Provision in the Reference Indentures.  Section 6.16(g) of the First Lien Credit Agreement limits the amount of the Principal Property First Lien to an automatically adjusting cap ("**Principal Property Cap**").  The Principal Property Cap, as defined in the First Lien Credit Agreement, means "as of the date of determination . . . 15% of [CNTA] as determined on such date under the applicable Reference Indenture minus . . . $50,000,000."  Accordingly, to determine the amount of the Principal Property Cap, one must look to when CNTA is calculated under the Reference Indentures.

8.     Under the Reference Indentures, CNTA is calculated when the Company incurs debt secured by a lien on Principal Property.  (Reference Indentures § 4.06.) CNTA is then calculated by taking "the total of all assets appearing on the most recent consolidated balance sheet" and subtracting "current liabilities" and then excluding from that deduction any portion of current liabilities "maturing after . . . twelve months." (Reference Indentures § 1.01.)

9.     The Company last incurred new debt secured by a lien on Principal Property on February 12, 2016 and "the most recent consolidated balance sheet" at that time was the Form 10-Q for the third quarter of 2015 ("**Q3 10-Q**").  Performing the calculation required under the Reference Indentures, CNTA is $10.147 billion.

10.     On May 20, 2016, mere days after receiving a final DIP financing order, the Company filed the Complaint and informed the First Lien Lenders for the first time that it interpreted the First Lien Credit Agreement in a manner that is transparently designed to deprive the First Lien Lenders of their security interest.  After having already received the benefit of the First Lien Credit Agreement that provided the Company with critical financing at the most critical of times, including a revolver draw of approximately $825 million in the days leading up to this bankruptcy, Peabody now seeks to deprive the First Lien Lenders of their bargained-for protections at precisely the moment those protections are needed.  The Company's newly adopted interpretation would have the effect of reducing the First Lien Lenders' security interest as of the Petition Date from approximately $1.47 billion (i.e., 15% of CNTA minus $50 million) to approximately $505 million.

11.     Accordingly, Citibank, as agent for the First Lien Lenders, brings this counterclaim for declaratory relief and requests that the Court interpret and enforce the terms of the relevant agreements in the unambiguous form in which they were written and issue an Order declaring that:

    a)  compliance with the Principal Property Covenant is measured using an incurrence test, not a maintenance test;

    b)  the term "Specified Indebtedness" in the Principal Property Covenant excludes any amount owing with respect to letters of credit, swap-agreements, and cash management;

    c)  the appropriate calculation of the Principal Property Cap, and specifically the term "current liabilities" for purposes of CNTA, excludes any long-

term debt with a stated maturity after twelve months from the date of the

last consolidated balance sheet;

   d)  the Principal Property Cap is approximately $1.47 billion; and

   e)  the Principal Property Cap does not apply to proceeds of the Principal

Property.

## PARTIES, JURISDICTION AND VENUE

12.     Counterclaim Plaintiff Citibank is a Delaware corporation with its

principal place of business at 399 Park Avenue, New York, New York 10022.

13.     Counterclaim Defendant Peabody is a Delaware corporation with its

principal place of business at 701 Market Street, St. Louis, Missouri 63101.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334(b)

as it arises under the Bankruptcy Code and it arises in and is related to the Bankruptcy.

15.     This proceeding is core under 28 U.S.C. § 157(b).

16.     This adversary proceeding is initiated under Federal Rules of Bankruptcy

Procedure 7001(9) and 7003.

17.     Venue is proper under 28 U.S.C. § 1409(a).

## BACKGROUND

### THE INDENTURES (2006 – 2011)

18.     Between October 2006 and November 2011, Peabody entered into a series

of indenture agreements with U.S. Bank National Association as Trustee (the "**Reference**

**Indentures**")[5] by which Peabody issued unsecured notes in an initial aggregate principal amount of $4 billion (the "**Indenture Notes**").

### The Incurrence-based Equal and Ratable Provision

19.     The Reference Indentures each contain a covenant restricting Peabody's ability to incur indebtedness secured by the Principal Property unless the Indenture Notes are "secured equally and ratably" with the new indebtedness (the "**Equal and Ratable Provision**").

20.     The Equal and Ratable Provision, contained in § 4.06 of the Reference Indentures, provides as follows (emphases added):

> *Except as otherwise provided below* pursuant to this Section 4.06, *the Company shall not, and shall not permit any Restricted Subsidiary to, issue, incur, create, assume, guarantee or otherwise have outstanding any Indebtedness secured by* any mortgage, deed of trust, security interest, pledge, lien, charge or other encumbrance, each *a "Lien" and collectively "Liens," upon any Principal Property* or shares of Capital Stock or Indebtedness of a Restricted Subsidiary *unless the Notes* (and, at the Company's option, any other indebtedness or guarantee ranking equally with the Notes) *are secured equally and ratably* with (or at the Company's option, prior to) such secured Indebtedness.
> . . .
> *In addition, the Company or any Restricted Subsidiary may issue, incur, create, assume or guarantee Indebtedness secured by a Lien . . . provided that after giving effect to the Indebtedness secured by such Lien, the aggregate principal amount of all Indebtedness so secured by Liens . . . does not exceed 15% of Consolidated Net Tangible Assets.*

21.     The Equal and Ratable Provision is limited in several important ways. First, it applies only to Principal Property, which under the Reference Indentures consists of "any real property interests . . . located in the United States that is held by the Company or any restricted Subsidiary and has a gross book value . . . on the date as of

---

[5] The Reference Indentures consist of the 2026 Notes Indenture, the 2020 Notes Indenture, and the 2021 & 2018 Notes Indenture, as defined in the Complaint ¶¶ 28, 30, 32.

which determination is made, exceeding 1% of [CNTA]." (Reference Indentures § 1.01.)
The Equal and Ratable Provision thus does not apply to proceeds of Principal Property.

22.    Second, the Equal and Ratable Provision does not apply when the amount
of Indebtedness secured by Principal Property "does not exceed 15% of Consolidated Net
Tangible Assets." (Reference Indentures § 4.06.)

23.    Third, and contrary to what the Counterclaim Defendants argue, § 4.06 is
devoid of any language suggesting that the Equal and Ratable Provision applies at any
time other than when the Company *issues or incurs new secured indebtedness*.

### Incurrence of Indebtedness

24.    The Reference Indentures define indebtedness as follows:

"*Indebtedness*" means, with respect to any Person, any indebtedness of such
Person, whether or not contingent, in respect of borrowed money or evidenced by
bonds, notes, debentures or similar instruments.

(Reference Indentures § 1.01)

25.    By its plain terms, this definition excludes swaps, letters of credit, and
cash management, which are not "in respect of borrowed money" nor are they evidenced
by any "bonds, notes, debentures or similar instruments."

### Calculation of CNTA under the Reference Indentures

26.    Pursuant to the Equal and Ratable Provision, CNTA is calculated when the
Company issues or incurs new debt to determine if the covenant is triggered. CNTA is
defined as follows (emphases added):

"*Consolidated Net Tangible Assets*" means, as of any particular time, the total of
all the assets appearing on the most recent consolidated balance sheet prepared in
accordance with GAAP of the Company and its Subsidiaries as of the end of the
last fiscal quarter for which financial information is available (less applicable
reserves and other properly deductible items) after deducting from such amount:

> (a) all current liabilities, including current maturities of long-term debt and current maturities of obligations under capital leases (**other than any portion thereof maturing after**, or renewable or extendable at the option of the Company or the relevant Subsidiary beyond, **twelve months from the date of determination**) . . .

(Reference Indentures § 1.01.)

27.     This formula lays out a simple calculation, but does not state when such calculation must be made.  That is left to other provisions of the Reference Indentures.  CNTA is defined as total assets as of the most recent consolidated balance sheet minus the current liabilities described in subparagraph (a).  When read in its entirety and when given its plain language meaning, subparagraph (a), and specifically the parenthetical in subparagraph (a), requires that any portion of long-term debt maturing after twelve months from the date of determination must be excluded from the current liabilities stated on the most recent balance sheet.

28.     Subparagraph (a) begins with the standalone term "current liabilities."  As acknowledged by Peabody in its Complaint, this term, while not separately defined in the Reference Indentures, has the meaning assigned to it in accordance with GAAP.  (Reference Indentures § 1.04(2).)

29.     The standalone term is then followed by an additional forty-three words encompassing a clause ("including current maturities of long-term debt and current maturities of obligations under capital leases") and a parenthetical ("other than any portion thereof maturing after, or renewable or extendable at the option of the Company or the relevant Subsidiary beyond, twelve months from the date of determination").  Subparagraph (a), read in its entirety, expressly modifies the term "current liabilities" by carving out "any portion" of long-term debt "maturing after . . . twelve months from the date of determination."  Accordingly, the current liabilities input into the CNTA formula

must be read to require the exclusion of debt or maturities that are not due within one

year, regardless of whether or not such debt or maturities are classified under GAAP as a

"current liability."

     30.    Peabody advocates for an interpretation of subparagraph (a) that, in effect,

deletes all but the first three words of subparagraph (a).  That is clearly not an

interpretation that gives plain meaning to each of the words in subparagraph (a).  Such an

interpretation would render the parenthetical nugatory.

## THE INITIAL CREDIT AGREEMENT (2013)

     31.    In 2013, Peabody faced financial difficulty from declining coal prices[6] and

sought financial relief.  Indeed, the Company informed investors that "[d]uring the third

quarter of 2013, [the three major credit rating] agencies downgraded our corporate credit

rating by one notch, due in part to prolonged weakness in global coal markets."  (2013

10-K 63.)

     32.    Its deteriorating financial condition caused the Company to face the

prospect that it would be unable to make payments on debt maturing in connection with

an existing credit facility.

     33.    Peabody avoided this outcome by obtaining relief from the First Lien

Lenders.  On September 24, 2013, Peabody entered into the 2013 Credit Agreement

pursuant to which the First Lien Lenders agreed to provide a $1.65 billion Revolving

Credit Facility and a $1.20 billion Term Loan Facility (the "**Credit Facility**").  Proceeds

of this agreement were used primarily to pay off the Company's (1) 2010 Credit

Agreement, which had an outstanding principal amount of $301.75 million, and (2) 2011

---

[6] Form 10-K (Feb. 21, 2014) ("**2013 10-K**") 46, 59.

Credit Agreement, which had an outstanding principal amount of $862.5 million. This allowed Peabody to extend any internal debt maturities until at least 2016. (Form 10-Q (Nov. 8, 2013) ("**2013 Q3 10-Q**") 23; 2013 10-K 63.)

34.     The 2013 Credit Agreement was unsecured, except for a pledge of 65 percent of Peabody Investments (Gibraltar) Limited, a holding company for Peabody's Australian operations, and a pledge of the stock of another holding company whose sole asset was an intercompany receivable.

35.     The 2013 Credit Agreement included two negative covenants. These covenants consisted of a maximum net secured leverage ratio and a minimum interest coverage ratio, which required the Company to maintain specified debt and profitability ratios. (2013 Q3 10-Q 23.) Failure to comply with these covenants would constitute a default under the 2013 Credit Agreement.

### THE FIRST LIEN CREDIT AGREEMENT (FALL 2014 – FEBRUARY 2015)

36.     Peabody's financial situation continued to deteriorate through 2014. Coal prices continued to decline due to an abundance of supply and slowing demand. In its 2014 10-K, the Company acknowledged that "strong supplies and declining seaborne coal prices have tempered near term expectations." (Form 10-K (Feb. 25, 2015) ("**2014 10-K**") 63.)

### First Lien Lenders Rescue Peabody from Certain Default and Assume Additional Credit Risk

37.     By the fall of 2014, the Company once again found itself in need of a financial lifeline from the First Lien Lenders. Faced with the prospect of a likely event of default due to Peabody's inability to satisfy the terms of its financing (including the two negative covenants in the 2013 Credit Agreement), Peabody and Citibank, on behalf of

the First Lien Lenders, entered into the Omnibus Amendment Agreement related to the 2013 Credit Agreement (the "**First Lien Credit Agreement**").

38.    The First Lien Credit Agreement provided several forms of emergency relief.  First, it rescued the Company from triggering an event of default by watering down the negative covenants.  Peabody represented that this relief provided "greater financial flexibility by (a) lowering the interest coverage ratio . . . and (b) increasing the net secured first lien leverage ratio."  (Form 8-K (Feb. 6, 2015) ("**2015 8-K**") 2.)

39.    Second, the First Lien Credit Agreement allowed the Company to access $1 billion in much needed additional financing.  The First Lien Lenders agreed to amend certain negative covenants that allowed for a second-lien debt issuance, which then paved the way for the Company to issue $1 billion in second-lien notes.  (2015 8-K 2.)

### First Lien Lenders Bargain for and Receive Additional Collateral

40.    In exchange for voluntarily providing the financial relief Peabody needed to avoid default, the First Lien Lenders bargained for a collateral package that would allow the First Lien Lenders to recoup the vast majority of their credit in the event Peabody defaulted on its obligations.

41.    The First Lien Credit Agreement therefore provided a lien on what Peabody described in the following 8-K as "substantially all of the Company's U.S. assets, including Principal Property," i.e., the Principal Property First Lien.  (2015 8-K 2.)

42.    The First Lien Credit Agreement defined Principal Property to be the functional equivalent of how the term was defined in the Reference Indentures:

> "*Principal Property*" means, with respect to any Reference Indenture (and any series of Specified Indebtedness issued thereunder), "Principal Property" or any functionally equivalent term as defined in any Reference Indenture in effect on such date . . .

28

(First Lien Credit Agreement § 1.01.)

### Principal Property Cap

43.     In order to avoid triggering the Equal and Ratable Provision contained in the Reference Indentures, the First Lien Credit Agreement contains the following covenant in § 6.16(g) of the First Lien Credit Agreement (emphases added):

> Notwithstanding anything to the contrary in any Loan Document . . ., to the extent that any portion of the Collateral consists of Principal Property . . ., (i) the aggregate amount of Specified First Lien Obligations constituting **Specified Indebtedness secured by Liens on Principal Property** . . . at any time **shall be limited, automatically and without further action by any Person, so that such amount does not exceed the Principal Property Cap at such time** . . .

(the "**Principal Property Covenant**").

44.     To determine the Principal Property Cap, the First Lien Credit Agreement refers to the incurrence test contained in the Equal and Ratable Provision in the Reference Indentures:

> [A]s of the date of determination, with respect to a lien securing Specified Indebtedness, 15% of Specified [CNTA] as determined on such date *under the applicable Reference Indenture* <u>minus</u> the sum of (a) $50,000,000 . . .

(First Lien Credit Agreement § 1.01.)

45.     Under the applicable Reference Indentures, CNTA is determined when Peabody issues or incurs new indebtedness secured by a lien on Principal Property, by looking at the most recent consolidated balance sheet prepared in accordance with GAAP. (Reference Indentures § 1.01.)

46.     Once the amount of CNTA is then determined pursuant to the Reference Indentures, the Principal Property Cap is calculated under the First Lien Credit Agreement by taking 15% of CNTA and subtracting $50 million.

47.     Finally, § 6.16(g) automatically adjusts the amount of the Principal Property First Lien so that it is within the Principal Property Cap as calculated when the Company last issued or incurred new secured indebtedness.

48.     As a practical matter and in the ordinary course of business, the Company calculated the Principal Property Cap and CNTA on a quarterly basis in connection with the issuance of its consolidated financials.  In accordance with the plain language of the Reference Indentures (which look back to the last consolidated balance sheet), that calculation of the Principal Property Cap would govern in the event the Company issued or incurred debt during that quarter.

## ACCOUNTING TREATMENT OF LONG-TERM DEBT

49.     On March 16, 2016, Peabody filed its 2015 10-K, which included the Company's most recent consolidated balance sheet as of the Petition Date.  The 2015 10-K balance sheet lists total assets of $11,021.3 million and total current liabilities of $7,392.3 million, a figure that includes $5,930.4 million of long-term debt with stated maturities beyond twelve months.

50.     During the Company's Fourth Quarter Earnings Call on February 11, 2016 (at a time when the Company surely had draft financials), Peabody Chief Financial Officer Amy Schwetz represented to investors that "total consolidated net tangible assets were $9.5 billion at the end of the year."  That number for CNTA can only be derived by excluding from current liabilities as of December 31, 2015 the long-term debt maturing beyond twelve months of that date.[7]  The Company has always calculated CNTA in this manner in all previous public statements.

---

[7] $11,021.3 million – ($7,392.3 million – $5.930.4 million) = $9,559.4 million.

### PRINCIPAL PROPERTY CAP AS OF THE PETITION DATE

51.    On April 13, 2016, the Debtors commenced the Bankruptcy.  The following day, the Bankruptcy Court entered an order that, inter alia, granted adequate protection to the First Lien Lenders (the "**Interim DIP Order**").  The Interim DIP Order stated that with respect to the Principal Property First Lien, "the 'Principal Property Cap' . . . shall be neither increased nor reduced" after the Petition Date."[8]  (Order ¶ 13(i).)

52.    The Principal Property Cap as of the Petition Date equals 15% of CNTA, as of when it was last required to be calculated under the Reference Indentures, minus $50 million.  The Order does not otherwise alter how CNTA is to be calculated.

53.    As of the Petition Date, the Company last incurred debt secured by a lien on Principal Property on February 12, 2016, when it drew down on the Revolving Credit Facility.  At that time, the most recent consolidated financial statement was included in the Q3 10-Q.  Based on this balance sheet, CNTA equals $10.147 billion.  This is calculated as follows:  ($11.663 billion in total assets) – ($1.516 billion in listed current liabilities).  The current liabilities in the Q3 10-Q does not include any long-term debt with stated maturities beyond twelve months and hence is not further reduced. Accordingly, the Principal Property Cap is approximately $1.47 billion (15% of $10.147 billion less $50 million).

54.    Even if the Court were to look at the most recent consolidated balance sheet as of the petition date, the one included in the 2015 10-K, CNTA does not materially change and would equal approximately $9.5 billion.  This is calculated as

---

[8] The Order further stipulated that "the First Lien Secured Parties and all other parties in interest reserve their rights with respect to the CNTA Dispute, including the interpretation and calculation of the 'Principal Property Cap.'"(Order ¶ 13(i).)

follows:  ($11.021 billion in total assets) – (($7.392 billion in listed current liabilities) – ($5.9 billion included long-term debt with stated maturities beyond twelve months). Accordingly, the Principal Property Cap using the 2015 10-K would be approximately $1.38 billion (15% of $9,559.4 million less $50 million).

55.     Nonetheless, Peabody now adopts—for the first time—a distorted reading of § 6.16(g) and the relevant provisions and asserts the Principal Property Cap should be interpreted by ignoring the plain and unambiguous language of the First Lien Credit Agreement and Reference Indentures, and in a way that would result in an absurdity that would reduce the Principal Property Cap from no less than $1.38 billion to $505 million as the Counterclaim Defendants claim.

### COUNT I
### (FOR DECLARATORY RELIEF)

56.     Citibank incorporates each of the above allegations by reference, as if fully set forth herein.

57.     The Reference Indentures permit the Company to issue or incur new indebtedness secured by liens on Principal Property without triggering the Equal and Ratable Provision—but only so long as the amount of total indebtedness does not exceed 15% of CNTA as of the date of incurrence.

58.     The First Lien Credit Agreement provides the First Lien Lenders with a first lien security interest in Principal Property, i.e., the First Lien Principal Property.

59.     The Principal Property Covenant, as stated in the First Lien Credit Agreement, automatically adjusts the amount of the First Lien Principal Property so that it does not exceed the Principal Property Cap.

60.    The Principal Property Cap is determined as of the most recent date the Company issued or incurred new indebtedness secured by a lien on Principal Property.

61.    The formula for CNTA, as stated in the Reference Indentures and as referenced by the First Lien Credit Agreement, requires that certain current liabilities with maturities exceeding twelve months as determined by subparagraph (a) of the CNTA definition be deducted from the total current liabilities appearing on the most recent consolidated balance sheet.

62.    An actual controversy exists between Citibank, on behalf of the First Lien Lenders, and Peabody in connection with when to determine the Principal Property Cap under the First Lien Credit Agreement and how to determine the current liabilities input for CNTA as defined in the Reference Indentures.

63.    Accordingly, Citibank, on behalf of the First Lien Lenders, submits the terms of the relevant agreements should be applied in the unambiguous form in which they were written and therefore requests an Order declaring that:

a)    compliance with the Principal Property Covenant is measured using an incurrence test, not a maintenance test;

b)    the term "Specified Indebtedness" in the Principal Property Covenant excludes any amount owing with respect to letters of credit, swap-agreements, and cash management;

c)    the appropriate calculation of the Principal Property Cap, and specifically the term "current liabilities" for purposes of CNTA, excludes any long-term debt with a stated maturity after twelve months from the date of the last balance sheet;

33

d)  the Principal Property Cap is an amount no less than $1.38 billion; and

e)  the Principal Property Cap does not apply to proceeds of Principal Property.

## COUNT II
### (FOR DECLARATORY RELIEF)

64.    Citibank incorporates each of the above allegations by reference, as if fully set forth herein.

65.    The First Lien Credit Agreement, with reference to the Reference Indentures, defines Principal Property to mean any real property interest located in the United States that exceeds one percent of CNTA as of the date the Company most recently issued or incurred indebtedness secured by a lien on Principal Property.

66.    An actual controversy exists between Citibank, on behalf of the First Lien Lenders, and Peabody in connection with which assets constitute Principal Property.

67.    Consequently, Citibank, on behalf of the First Lien Lenders, seeks a declaration that the plain and unambiguous language of the definition of Principal Property requires that what constitutes Principal Property is determined as of the date the Company most recently issued or incurred new indebtedness secured by a lien on Principal Property.

68.    Accordingly , the Court should declare Principal Property is limited to real property interests located in the United States that are valued in excess of $101 million (and in no event less than $95 million).

## PRAYER FOR RELIEF

WHEREFORE, Citibank respectfully requests that this Court enter judgment:

1.   Declaring that, with regards to the First Lien Credit Agreement, compliance with the Principal Property Covenant is measured using an incurrence test, not a maintenance test;

2.   Declaring that, with regards to the First Lien Credit Agreement, the term "Specified Indebtedness" in the Principal Property Covenant excludes any amount owing with respect to letters of credit, swap-agreements, and cash management;

3.   Declaring that, with regards to the First Lien Credit Agreement, the appropriate calculation of the Principal Property Cap, and specifically the term "current liabilities" for purposes of CNTA, excludes any long-term debt with a stated maturity after twelve months from the date of the last balance sheet;

4.   Declaring that, with regards to the First Lien Credit Agreement, the Principal Property Cap does not apply to proceeds of Principal Property;

5.   Declaring that as of the Petition Date, the amount of the Principal Property Cap is $1.47 billion (and in no event less than $1.38 billion);

6.   Declaring that as of the Petition Date, Principal Property is limited to real property interests located in the United States that are valued in excess of $101 million (and in no event less than $95 million); and

7.   Awarding Citibank any and all other relief, at law or in equity, to which Citibank may be entitled, including its costs and attorney's fees.

Dated:   St. Louis, Missouri            Respectfully submitted,
         June 13, 2016

                                        /s/ Brian C. Walsh
                                        _____
                                        BRYAN CAVE LLP

                                        Lloyd A. Palans, #22650MO
                                        Brian C. Walsh, #58091MO
                                        Laura Uberti Hughes, #60732MO

                                        One Metropolitan Square
                                        211 N. Broadway, Suite 3600
                                        St. Louis, Missouri 63102
                                        (314) 259-2000
                                        Fax:  (314) 259-2020
                                        lapalans@bryancave.com
                                        brian.walsh@bryancave.com
                                        laura.hughes@bryancave.com

                                        -and-

                                        DAVIS POLK & WARDWELL LLP

Benjamin S. Kaminetzky (admitted *pro hac vice*)
Damian S. Schaible (admitted *pro hac vice*)
James I. McClammy (admitted *pro hac vice*)
Michael J. Russano (admitted *pro hac vice*)
Darren S. Klein (admitted *pro hac vice*)

450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 710-5800

*Co-counsel to Citibank, N.A.*